UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JASON LAWTON,<br>                *Plaintiff,*<br><br>vs.<br><br>STATE OF RHODE ISLAND, DIVISION OF STATE POLICE,<br>                *Defendant.* | C.A. No. 2023-cv-00412 |

## COMPLAINT

1. This Complaint arises out of allegations of violations of civil rights, disability discrimination and state and federal medical leave laws.

## JURISDICTION

2. The jurisdiction of this Court is invoked pursuant the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, 42 U.S.C. § 1983, the Rhode Island Parental and Family Medical Leave Act ("R.I. PFMLA"), G.L. 1956 § 28-48-1 *et seq.*, and the Rhode Island Civil Rights Act, G.L. 1956 § 42-112-1 et seq.

## PARTIES

3. Plaintiff, Jason Lawton ("Plaintiff") is a citizen of the United States and a resident of the State of Rhode Island.

4. Defendant State of Rhode Island, Division of the State Police ("Division" or "State"), is a department of state government and Plaintiff's former employer.

## STATEMENT OF FACTS

5. Plaintiff began his employment with the Division as a Rhode Island State Trooper in November 1997.

6. Plaintiff was promoted several times during the course of his employment with the Division.

7. Most recently, in November 2020, Plaintiff was promoted to Lieutenant.

8. Plaintiff was assigned to the Patrol Division as Night Executive, which essentially means the patrol supervisor for the shift statewide.

9. Plaintiff worked a rotating schedule of three 12-hour shifts (8 p.m. to 8 a.m.) followed by three days off.

10. In December 2021, Plaintiff signed a disciplinary consent agreement that included a two-day suspension.

11. A disciplinary suspension means an employee is prohibited from reporting to work as a form of punishment and receives no pay.

12. The discipline was issued after the Division determined that Plaintiff violated policy by failing to report a consensual dating relationship with another trooper.

13. The Division did not request or insist, as part of the agreement, that the suspension be served on any particular date.

14. The agreement did not afford the Division the right to unilaterally select the dates upon which the suspension days would be served.

15. Instead, the parties agreed that Plaintiff could serve the suspension days at any time before January 31, 2022.

16. This provision allows Plaintiff to select the dates of the suspension.

17. Allowing Plaintiff to select the timing of the suspension days was consistent with well-settled policy and practice of the Division.

18. This practice allows the Trooper to manage the financial impact of the suspension.

19. This practice benefits the Division in that if the suspension days are spread out, it may lessen the operational impact associated with filling the Plaintiff's assignment.

20. This agreement benefits the Division because it would allow Plaintiff to take the days off after the holidays when it is easier to replace Plaintiff.

21. The agreement further provided that "upon [Plaintiff's] return to duty" from serving the suspension days, he would be reassigned to the front desk at the Scituate Barracks for a period not less than thirty (30) days.

22. The agreement provided that Plaintiff, *after* he served his suspension days, *and when he was reassigned to the front desk*, he would serve a probationary period of three (3) months.

23. Thus, the Division agreed, by the plain language of the agreement, that since service of both suspension days was a pre-condition to reassignment and probation, the probationary period could start as late as January 31.

24. The agreement provided that if Plaintiff violated the rules and regulations *during the probationary period*, he could be disciplined, up to and including dismissal, without rights under the Law Enforcement Officers' Bill of Rights ("LEOBOR").

25. The intent of this provision was not to permit the Division to discipline Plaintiff without a hearing under LEOBOR for *pre-probationary period* alleged misconduct.

26. The Division chose to use an agreement originally drafted for a different Trooper and amended it as it saw fit for the Plaintiff's situation.

27. The Division drafted the agreement absent any participation or negotiation with Plaintiff.

28. The totality of the terms of the agreement represented an excessive disciplinary measure which was disproportionate to the offense.

29. The Colonel of the State Police at that time was Colonel James Manni ("Manni").

30. Shortly after the Division required Plaintiff to execute the agreement, on December 14, 2021, Major John Allen ("the Major") requested that Plaintiff give Manni a ride to the airport in a Division vehicle.

31. Plaintiff was on duty at the time and Manni's trip was personal.

32. During the ride to the airport, Manni expressed his willingness to allow Plaintiff to forfeit two vacation days for the two suspension days, and to reduce the length of the front desk assignment from 30 days to 14 days.

33. During this conversation, Plaintiff revealed the existence of a number of personal stressors to Manni and Manni suggested Plaintiff seek mental health treatment with a health care provider who routinely provides mental health support to Troopers (the "Division psychologist").

34. The Division psychologist offers crisis intervention and stress management services to Rhode Island's emergency service personnel through the Rhode Island Critical Incident Management TEAM, Inc.

35. Accordingly, Manni was aware that Plaintiff was having mental health issues and/or perceived that Plaintiff had mental health issues at least as of December 14.

36. Between December 8, when the Plaintiff executed the agreement, and December 25, Plaintiff continued in his assignment as the Night Executive.

37. Plaintiff did not serve any suspension days between December 8 and December 25.

38. Plaintiff was not reassigned to the front desk or to any other assignment between December 8 and December 25.

39. Upon information and belief, Division records did not reflect that Plaintiff had been placed on suspension between December 8 and December 25.

40. On December 21, Plaintiff wrote to the Major requesting to discharge 10 vacation days in January 2022.

41. In the same e-mail, Plaintiff notified the Major that he decided to discharge the suspension days on January 4 and January 18, 2022.

42. In response, the Major questioned the use of 5 of the 10 vacation days.

43. The Major did not question Plaintiff's decision about the timing of the suspension days.

44. Upon information and belief, the Major accepted and did not object to Plaintiff's scheduling of suspension days on January 4 and January 18.

45. Prior to December 25, Plaintiff was suffering from mental health issues, as preliminarily highlighted in his conversation with Manni on December 14.

46. Plaintiff was suffering from a serious medical condition as that term is defined under state and federal medical leave laws.

4

47. On Christmas Day, Plaintiff's mental health condition reached a breaking point.

48. Plaintiff was found at home when he did not report to work.

49. Plaintiff's supervisor came to Plaintiff's residence and personally observed Plaintiff's incapacitation.

50. Plaintiff was clearly in crisis due to a mental health issue and too ill to report to work, mentally and physically.

51. Plaintiff was entitled to discharge sick leave under Division policy which provides for unlimited sick time.

52. As a result of his incapacitation, Plaintiff was marked sick and scheduled to be paid sick leave on December 25 and December 26 in accordance with his time records completed and submitted by appropriate Division employees.

53. Significantly, Plaintiff was not suspended on December 25 and 26 – he was not scheduled to take his suspension days and he was not prohibited from working those days as a disciplinary measure – the reason he was not at work was because of personal illness.

54. Prior to the events of December 25, there had been no discussion about Plaintiff taking suspension days on December 25 and 26.

55. While Plaintiff was on sick leave, he sought treatment for his serious medical condition.

56. Plaintiff was not scheduled to work on December 27, 28, 29, 2021.

57. Plaintiff was scheduled to be on sick leave for his next rotation, December 30, 31, and January 1, 2022.

58. When an employee is out of work due to personal illness, although sick leave entitlement is unlimited, at some point, the Division's Human Resources division will discuss with the employee his or her need for sick leave, the availability of state and federally protected medical leave and communicate to the employee the need for any documentation, if applicable.

59. Plaintiff sought medical documentation from a social worker he began treating with as a result of his serious medical condition and was in communication with Human Resources.

60. Significantly, although Plaintiff was legally entitled to be out of work on paid sick leave while treating for his serious medical condition, the Division's Captain of Internal Affairs (the "Captain") who was not Plaintiff's supervisor, made a decision which critically impacted Plaintiff's 20-plus-year career as a State Trooper.

61. The Captain contacted the Division employee responsible for payroll and directed her to retroactively change Plaintiff's already-completed time records so that instead of being paid sick leave for December 25 and 26, Plaintiff would be recorded as having served the two disciplinary suspension days.

62. This was a fiction as Plaintiff had not, in fact, been suspended on those days either by his choice or by the Division.

63. Upon information and belief, this was done because the Captain knew that the probationary period would not begin until the suspension days were served, and the Division wanted Plaintiff to be on probation as of the Christmas Day incident when Plaintiff did not report to work.

64. The Division wanted Plaintiff to be characterized as "on probation" even though, in reality, Plaintiff was not on probation on December 25.

65. If Plaintiff's actions violated his probation, the Division could avoid the due process provisions of LEOBOR and/or would have leverage to take more severe disciplinary action without independent review.

66. In the alternative, even if the decision to retroactively impose the suspension had unintended consequences, the impact of the decision was to allow the Division to try to make the argument that Plaintiff was on probation at the time of the alleged misconduct of December 25.

67. This decision, to treat December 25 as a disciplinary event and now, as one that took place during the fictional probationary period, is the opposite of what employers are supposed to do when they have information that an employee is potentially suffering from a mental health issue.

68. This decision represents an antiquated view of mental health issues that are inconsistent with Division policy and widely accepted standards – to punish an employee who is suffering from a mental health condition.

69. Some members of the Division were less concerned about Plaintiff's serious medical condition and more concerned with the impact of the administrative machinations that had to take place to cover his shift on Christmas Day.

70. The day after the incident, on December 26, another Major who used to be in peer support contacted Plaintiff. The Major suggested that Plaintiff seek treatment and recommended the same mental health professional suggested by Manni (the Division psychologist).

71. Plaintiff contacted the Division psychologist and sought treatment with her, a specialist in crisis intervention and stress management.

72. Plaintiff told Major Allen, among others, that he was getting counseling.

73. Despite the foregoing, the payroll clerk followed the Captain's directive without communicating directly with the Plaintiff.

74. The plain language of the disciplinary agreement provides that it may not be modified unless it is done so in writing and executed by both parties.

75. Before retroactively changing the time records, the Division did not negotiate any change to the disciplinary agreement concerning the timing of the service of the suspension days.

76. The Captain sent the directive to change the records to payroll on December 28.

77. The Captain notified Plaintiff of the decision he made which was a *fait accompli*.

78. The Captain did not ask for Plaintiff's permission or agreement.

79. Plaintiff did not consent to the order to retroactively impose the suspension.

80. The following day, on December 29, the Division notified Plaintiff that he was under investigation for alleged misconduct in connection with his failure to report for work on December 25.

81. In other words, the Division did not first notify Plaintiff that it was considering the events of December 25 to be a serious disciplinary matter before it retroactively changed the time records.

82. The Division then changed Plaintiff's status from sick leave to administrative leave.

83. Reflecting again that the Division was aware that Plaintiff was sick and most likely not mentally fit for duty, on December 29, Manni wrote a lengthy memorandum concerning facts relevant for a fitness for duty examination for Plaintiff.

84. In that memorandum, Manni reported his concern for Plaintiff's mental health and related that he recommended Plaintiff consult with the Division psychologist.

85. Manni transmitted his memorandum to the Director of Human Resources.

86. Also on December 29, the Major reached out to Human Resources looking for paperwork submitted by Plaintiff related to his illness.

87. By January 3, the Director of Human Resources was in receipt of a detailed medical note from Plaintiff's treatment provider which contained a diagnosis that qualified as a serious medical condition.

88. The treatment provider made an unambiguous request that Plaintiff be provided a forty-five (45) day medical leave.

89. The Director of Human Resources acknowledged receipt of Plaintiff's note and merely informed him that it was likely that before he would be able to return at the end of his leave, he would need to undergo a fitness for duty examination.

90. The Director of Human Resources did not inform Plaintiff of any other rights or obligations.

91. The Director of Human Resources notified the Major that she received the medical information and that she would be speaking with the State Department of Disability Management ("DMU") to discuss Plaintiff's request.

92. The Division had sufficient information that Plaintiff had a serious medical condition and was entitled to remain on paid sick leave and be covered by the FMLA and corresponding state law.

93. The Division never formally responded to Plaintiff's request for medical leave.

94. The Division did not inform Plaintiff of his right to leave under state and federal medical leave laws.

95. The Division never transmitted to Plaintiff any paperwork from the DMU requesting further information.

96. The Division did not place Plaintiff on FMLA or RI PFMLA leave.

97. The Division's actions were inconsistent with state and federal law, and contrary to the State's medical leave and sick leave policies.

98. After January 3, Human Resources did not communicate to Plaintiff that any of his leave from December 25 to this point was unauthorized or that the Division needed any additional documentation to grant him paid sick leave.

99. Plaintiff continued on approved leave until January 20, seeking treatment with three different health care providers (the Division psychologist, his own social worker and a medical doctor).

100. On January 20, 2023, Manni summarily terminated Plaintiff's employment by letter, without notice of his right to a hearing under LEOBOR.

101. As grounds for not affording Plaintiff of his notice of right to hearing, Manni took the position that Plaintiff was on probation.

102. Manni initially took the position that Plaintiff's probation started the date he signed the disciplinary consent agreement (December 8), citing language from a different agreement with a different trooper.

103. The Division later conceded probation did not start December 8.

104. The Division then took an alternative approach arguing that Plaintiff was on probation on December 25 because of the Captain's decision to retroactively impose the two suspension days on December 25 and 26.

105. The Division ignored the fact that the December 8 agreement had not been amended to permit it to impose the suspension days retroactively and unilaterally as opposed to letting Plaintiff decide when to discharge them, at any point before January 31.

106. The Division ignored the fact that Plaintiff had already chosen his suspension dates and his supervisor had agreed with his choices.

107. The Division ignored the fact that, in all events, both suspension days could not have been served as of December 25 (even if retroactive and fictional).

108. The Division ignored the fact that Plaintiff had not yet returned to duty following service of the suspension days.

109. At the time of his dismissal, Plaintiff had not yet been reassigned to the front desk.

110. At the time of his dismissal, Plaintiff had not undergone any "training, oversight and counseling" as contemplated by the agreement during probation.

111. At no time did anyone from the Division notify Plaintiff that he had been placed on probation.

112. The Division's decision to characterize Plaintiff's status as on probation was inconsistent with the disciplinary agreement.

113. Plaintiff filed a petition under LEOBOR challenging the Division's determination to terminate his employment without a hearing.

114. Plaintiff challenged the Division's authority to impose the suspension days retroactively.

115. The Superior Court issued two decisions on motions for summary judgment, both of which found, among other things, that disputes of fact prohibited granting the Plaintiff's motion for summary judgment.

116. The Superior Court matter remains pending as the parties await an evidentiary hearing under G.L. 1956 § 42-28.6-14 (b) ("Any law enforcement officer who is denied any right afforded by this subtitle may apply, either individually or through his or her certified or recognized employee organization, to the superior court where he or she resides or is regularly employed for any order directing the law enforcement agency to show cause why the right should not be afforded.").

117. After the Division ended Plaintiff's career for not reporting to work while undergoing a mental health crisis, the Major notified a Sergeant who was responsible for submitting the Plaintiff's time sheets that the "Lt. Colonel" (now Colonel Weaver) had questions about the time sheets he completed and submitted on behalf of Lawton recording his time out of work as sick leave.

118. The suggestion was that the Sergeant made a mistake recording Plaintiff as out of work due to personal illness.

119. The Sergeant then wrote an e-mail and memorandum explaining his actions indicating that he recorded Plaintiff's time as sick leave because he was "unsure" of Plaintiff' status.

120. The Sergeant drafted and offered to submit new revised time sheets (9 days after Plaintiff was terminated) reflecting that Plaintiff was on administrative leave rather than sick leave.

## COUNT I

### 42 U.S.C. § 1983
### Fourteenth Amendment – Due Process

121. Plaintiff hereby incorporates all paragraphs above as if set forth herein.

122. Defendants, acting under color of state law, by their individual and/or concerted acts and/or omissions, including, but not limited to those described herein, have violated Plaintiff's due process rights by causing him to suffer harm as aforesaid, and have thereby deprived Plaintiff of his rights secured by the Fourteenth Amendment of the United States Constitution, actionable pursuant to 42. U.S.C. § 1983.

123. At all times, Defendant acted intentionally with respect to Plaintiff's clearly established constitutionally protected rights to both procedural and substantive due process.

124. Defendant's violation of Plaintiff's constitutional rights has caused him harm in an amount to be proven at trial.

## COUNT II

### Family and Medical Leave Act ("FMLA")
### 29 U.S.C. § 2601 *et seq.*

125. Plaintiff incorporates by reference Paragraphs 1 through 124 as if fully set forth herein.

126. By the aforesaid actions, Defendant has violated and/or willfully violated the FMLA by

127. Plaintiff is damaged as a proximate result of the Defendant's intentional and willful conduct.

## COUNT III

### R.I. Parental and Family Medical Leave Act
### G.L. 1956 § 42-28-1 *et seq.*

128. Plaintiff incorporates by reference Paragraphs 1 through 127 as if fully set forth herein.

129. By the aforesaid actions, Defendant has violated and/or willfully violated the FMLA by

130. Plaintiff is damaged as a proximate result of the Defendant's intentional and willful conduct.

## COUNT IV

### R.I. Civil Rights Act ("RICRA")
### G.L. 1956 § 42-112-1 *et seq.*

131. Plaintiff incorporates by reference Paragraphs 1 through 130 as if fully set forth herein.

132. At all relevant times, Plaintiff was a qualified individual with a disability is defined as an individual with a disability.

133. Among other things, Plaintiff was diagnosed with adjustment disorder which is a mental impairment for purposes of RICRA.

134. Plaintiff's adjustment disorder substantially limited a number of major life activities such as focusing, sleeping, communicating, interacting with others, and working.

135. Plaintiff sought reasonable accommodation in the nature of medical leave.

136. Not only did Defendant deny Plaintiff's request for accommodation, but it also terminated his employment, in whole or in part, because of his actual disability, record of disability, and/or perceived disability.

137. Defendant will be unable to demonstrate that the accommodation requested by Plaintiff would have caused the Division any undue hardship.

138. Defendant's discriminatory and retaliatory actions are in violation of RICRA.

139. Plaintiff is damaged as a proximate result of the Defendant's intentional and willful

conduct.

## **PRAYER FOR RELIEF**

Plaintiff prays that this Court:

(1) declare that the Defendant's actions complained of are unlawful;
(2) order the Defendant's to make the Plaintiff whole;
(3) order that the Defendant pay Plaintiff compensatory damages;
(4) order that the Defendant pay Plaintiff punitive damages;
(5) order that the Defendant pay Plaintiff liquidated damages;
(6) retain the jurisdiction of this action to ensure full compliance;
(7) order the Defendant to pay Plaintiff costs and expenses and reasonable attorney's fees;
(8) grant such other relief to Plaintiff as the court deems just and proper.

Plaintiff's damages are in an amount sufficient to invoke the jurisdiction of this Court.

## **JURY TRIAL DEMAND**

Plaintiff demands a trial by jury.

Plaintiff,
By his Attorney,

/s/ Carly Beauvais Iafrate

_____
Carly Beauvais Iafrate, #6343
Law Office of Carly B. Iafrate, PC
408 Broadway, 1st Fl.
Providence, RI 02909
(401) 421-0065
ciafrate@verizon.net